**No. 16-5527**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

CHERYL MARTIN and ROBERT MARTIN,

Plaintiffs-Appellants,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security

Defendant-Appellee.

---

On Appeal from the United States District Court
for the Eastern District of Kentucky

---

**BRIEF FOR APPELLEE**

---

*Of Counsel:*

ANDY LIU
*General Counsel*

AMANDA GILMAN
*Staff Attorney*

*Social Security Administration*

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney
General*

KERRY B. HARVEY
*United States Attorney*

MARK B. STERN
THOMAS PULHAM
*Attorneys, Appellate Staff
Civil Division, Room 7323
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-514-4332*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................................ vii

INTRODUCTION ................................................................................... 1

STATEMENT OF JURISDICTION............................................................... 3

STATEMENT OF THE ISSUE..................................................................... 4

STATEMENT OF THE CASE...................................................................... 4

    A.    Statutory Background.................................................................4

    B.    Factual Background...................................................................8

        1.    The Fraudulent Scheme of Attorney Eric Conn And
            Administrative Law Judge David B. Daugherty.......................9

        2.    SSA's Response To The Fraud..............................................12

    C.    Prior Proceedings ...................................................................17

    D.    Administrative Proceedings Following The Filing Of Suit ...............22

SUMMARY OF ARGUMENT .................................................................... 24

STANDARD OF REVIEW ........................................................................ 26

ARGUMENT ........................................................................................ 27

I.    The District Court Correctly Dismissed Plaintiffs' Complaint For
    Failure To Exhaust Administrative Remedies............................................. 27

    A.    The Social Security Act Requires The Channeling Of Claims
        Through SSA Before They Can Be Raised In Court .........................27

    B.    Waiver Of Exhaustion Is Not Appropriate.........................................30

1.    Plaintiffs' Claims Are Not "Entirely Collateral" To A Claim For Benefits ...................................................................31

2.    The Plaintiffs Have Not Identified Harm Related To A Colorable Constitutional Claim ................................................37

3.    A Practical Consideration Of The Policies Underlying Exhaustion Counsels In Favor Of Enforcing The Requirement In This Case.........................................................41

C.    There Is No Separate Futility Exception To The Exhaustion Requirement Of § 405(g) ....................................................44

CONCLUSION ....................................................................................... 45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*Avocados Plus, Inc. v. Veneman,*
  370 F.3d 1243 (D.C. Cir. 2004) ........................................................44

*Bagby v. Harris,*
  650 F.2d 836 (6th Cir. 1981) ...........................................................39

*Bowen v. City of New York,*
  476 U.S. 467 (1986) .............................................................. *passim*

*Cathedral Rock of N. Coll. Hill, Inc. v. Shalala,*
  223 F.3d 354 (6th Cir. 2000) ........................................... 26, 32, 34, 38

*Cochran v. U.S. Health Care Fin. Admin.,*
  291 F.3d 775 (11th Cir. 2002) ........................................................44

*Day v. Shalala,*
  23 F.3d 1052 (6th Cir. 1994) ...........................................................32

*Duncan v. Secretary of Health & Human Servs.,*
  801 F.2d 847 (6th Cir. 1986) ...........................................................42

*Elgin v. Department of Treasury,*
  132 S.Ct. 2126 (2012) ....................................................................36

*Goldberg v. Kelly,*
  397 U.S. 254 (1970) ................................................................. 16, 39

*Golden v. Commissioner,*
  548 F.3d 487 (6th Cir. 2008) ...........................................................31

*Harkness v. United States,*
  727 F.3d 465 (6th Cir. 2013) ...........................................................36

*Heckler v. Lopez,*
  463 U.S. 1328 (1983) .....................................................................37

*Heckler v. Ringer,*
  466 U.S. 602 (1984) ............................................................... *passim*

*Lamay* v. *Commisioner of Soc. Sec.*,
562 F.3d 503 (2d Cir. 2009) ...............................................................39

*Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*,
71 F.3d 574 (6th Cir. 1995) ......................................................... 34, 45

*Mathews v. Diaz*,
426 U.S. 67 (1976) ...........................................................................43

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ................................................................ *passim*

*Oakland Med. Grp. v. Secretary of Health & Human Servs.*,
298 F.3d 507 (6th Cir. 2002) ....................................................... 25, 38

*Robertson v. Colvin*,
2016 U.S. Dist. Lexis 79007 (S.D.W.V. June 17, 2016) ....................................20

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000) ................................................................ *passim*

*Taransky v. Secretary of U.S. Dep't of Health & Human Servs.*,
760 F.3d 307 (3d Cir. 2014) ...............................................................36

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ..........................................................................37

*Weinberger v. Salfi*,
422 U.S. 749 (1975) ............................................................. 27, 41, 44

**Statutes:**

28 U.S.C. § 1291 ..................................................................................4

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1361 ..................................................................................3

42 U.S.C. § 401 *et seq* ..........................................................................4

42 U.S.C. § 405(b)(1) ............................................................................7

42 U.S.C. § 405(g) ......................................................................... 3, 4, 8, 19, 24, 27

42 U.S.C. § 405(h) .........................................................................................28

42 U.S.C. § 405(u) .........................................................................................20

42 U.S.C. § 405(u)(1)(A) ........................................................................ 1, 7, 13

42 U.S.C. § 405(u)(1)(B) ..................................................................... 1, 7, 14, 33

42 U.S.C. § 406(a)(1) .....................................................................................39

42 U.S.C. § 421(i)(1) .......................................................................................6

42 U.S.C. § 423(d)(2)(A) ..................................................................................5

42 U.S.C. § 1320a-8(*l*) ........................................................................... 1, 7, 13

42 U.S.C. § 1381 *et seq* ...................................................................................5

42 U.S.C. § 1382(c)(3)(B) .................................................................................5

**Regulatory Materials:**

20 C.F.R. § 404.900 *et seq* ...............................................................................8

20 C.F.R. § 404.929 ........................................................................................8

20 C.F.R. § 404.930 ........................................................................................8

20 C.F.R. § 404.967 ........................................................................................8

20 C.F.R. § 404.1594(a) ............................................................................ 6, 41

20 C.F.R. § 404.1594(c)(3)(ii) ...........................................................................6

Notice, 74 Fed. Reg. 6080 (Feb. 4, 2009) ...........................................................11

Social Security Ruling 16-1p, 81 Fed. Reg. 13436 (Mar. 14, 2016) ................. 7, 41

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ..........................................................................4

**Legislative Material:**

U.S. Senate Committee on Homeland Security and Governmental Affairs, Staff Report, *How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm* (Oct. 7, 2013) ........................................... 9, 10, 11, 12, 13

**Other Authorities:**

Complaint, *Martin v. SSA*, No. 7:16-cv-111 (E.D. Ky. June 3, 2016) ............. 24, 43

Indictment, *United States v. Conn*, No. 5:16-cr-22 (E.D. Ky. Apr. 1, 2016) ..........12

Social Security Administration, *Hearings, Appeals, and Litigation Law Manual* (HALLEX) .............................................................................................7

Social Security Administration, *Reviewing Your Disability*, Publication No. 05-10068 (Nov. 2015) ..................................................................6

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument.  The district court correctly dismissed plaintiffs' amended complaint, but oral argument might be beneficial to the Court in light of the importance of the jurisdictional issue presented by this appeal.

## INTRODUCTION

The Social Security Act requires the Inspector General of the Social Security Administration to notify the agency "[a]s soon as the Inspector General . . . has reason to believe that fraud was involved in the application of an individual" to benefits.  42 U.S.C. § 1320a-8(*l*).  A complementary provision mandates that "[t]he Commissioner of Social Security shall immediately redetermine the entitlement of individuals" for benefits "if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." *Id.* § 405(u)(1)(A).  In making a redetermination, the agency is required by statute to "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence."  *Id.* § 405(u)(1)(B).

Following an investigation into a massive fraudulent scheme involving a prominent attorney, several doctors, and an administrative law judge, the Inspector General found reason to believe that fraud was involved in over 1,700 applications for benefits.  As required by law, the Inspector General provided this information to the agency.  The Social Security Administration accordingly reviewed the case files of the affected individuals and informed those whose case files did not support a finding of disability that it would conduct new hearings to redetermine their original entitlement.  The final administrative decisions resulting from these redetermination proceedings are subject to judicial review.  To date, the agency has

held hearings in approximately 93% of the cases remanded for a new hearing and decision, almost half of which have resulted in a fully or partially favorable determination of eligibility.

Plaintiffs Cheryl Martin and Robert Martin brought this putative class action on behalf of a subgroup of claimants whose entitlement would be redetermined in hearings before a newly assigned administrative law judge. Both named plaintiffs (and indeed all members of the putative class) were represented before the agency by the attorney at the heart of the fraudulent scheme, relied on evidence provided by one of the doctors implicated in the scheme, and received a favorable determination of disability from the administrative law judge involved in the scheme. Following a redetermination hearing, the administrative law judge in Robert Martin's case determined that he had not established entitlement to benefits, and Mr. Martin has filed suit to challenge that decision in district court. Cheryl Martin has also received a hearing, but she has not yet received a decision from an administrative law judge. For all putative class members, including the named plaintiffs, benefits have continued unless and until an administrative law judge issues an adverse decision after a hearing.

The district court properly dismissed plaintiffs' complaint as premature. The Social Security Act provides for judicial review—as in Mr. Martin's individual suit—only after a claimant exhausts administrative remedies. The Social Security

2

Administration has not waived exhaustion and the extremely narrow circumstances in which a court may deem this requirement waived are not present here. The precise scope of plaintiffs' argument is unclear. But the gravamen of their suit is that, despite Congress's directive that entitlement be "immediately redetermine[d]" if there is reason to believe fraud occurred in an application for benefits, the district court should enjoin the Social Security Administration from redetermining their entitlement or else require it to consider the evidence provided by doctors implicated in the fraud identified by the Inspector General. Those contentions are not wholly collateral to their claim for benefits, nor do they state a colorable constitutional claim. A beneficiary who receives an unfavorable decision on redetermination, such as Robert Martin, may raise his arguments in district court based on a full administrative record, as Mr. Martin himself has already done in a separate individual action. The district court correctly concluded that this lawsuit—which seeks preemptively to challenge redetermination proceedings before the agency has reached a final decision—is barred by the Social Security Act's exclusive mechanism for judicial review.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 42 U.S.C. § 405(g). Am. Compl., RE 11, PageID# 129. The district court dismissed the complaint for lack of jurisdiction on November 16,

2015, and denied plaintiffs' motion for reconsideration on April 1, 2016.  Mem. Op., RE 33, PageID# 436-45; Mem. Op. Recons., RE 40, PageID# 523-33. Plaintiffs filed a timely notice of appeal on April 20, 2016.  Appeal Notice, RE# 41, PageID# 534; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The Social Security Act provides for judicial review of a "final decision of the Commissioner of Social Security made after a hearing."  42 U.S.C. § 405(g). The question presented on this appeal is whether the plaintiffs should have been permitted to invoke the district court's jurisdiction to halt redetermination hearings before any decisions are made regarding their entitlement to benefits.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**  The Social Security Administration (SSA) pays disability benefits through two distinct programs.  The Social Security disability insurance program (SSDI) established by Title II of the Social Security Act (the Act), 42 U.S.C. § 401 *et seq.*, is, as the name suggests, an insurance program.  SSDI pays benefits to people, without regard to financial need, who previously contributed to the program and currently suffer from a disability.  (It also pays benefits to certain family members of disabled workers.)  The Supplemental Security Income

4

program (SSI) established by Title XVI of the Act, 42 U.S.C. § 1381 *et seq*., is a welfare program. SSI provides benefits to indigent disabled persons. Both programs use the same definition of disability, under which an individual is properly found to be under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).[1]

SSA regulations governing entitlement to SSDI benefits establish a "sequential evaluation" process. *See generally Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986) (describing the five-step process). If a claimant not engaged in substantial gainful activity is determined to have a "severe" impairment that meets or equals one of the agency's "Listing of Impairments," the claimant is presumed to be disabled and entitled to benefits. *Id.* If the claimant's impairment is not listed or medically equivalent to a listed impairment, the process moves to an assessment of "residual functional capacity" (RFC), which measures an individual's capacity to engage in work-related activities. *Id.* at 471. Benefits will

---

[1] Because the putative class in this case is defined by reference to SSDI benefits, *see infra* pp. 17-18 & n. 5, statutory and regulatory references from here on will be limited to provisions in Title II. SSI recipients are governed by parallel provisions in Title XVI and the implementing regulations.

be awarded if the claimant's residual functional capacity does not permit either the performance of prior work or the capacity to perform other work. *Id.*

The Act requires periodic reviews of a beneficiary's continuing eligibility. 42 U.S.C. § 421(i)(1); *see generally* SSA, *Reviewing Your Disability*, Publication No. 05-10068 (Nov. 2015), available at https://www.ssa.gov/pubs/EN-05-10068.pdf. During these continuing disability reviews, SSA considers whether "there has been any medical improvement in [the] impairment(s) and, if so, whether this medical improvement is related to [the beneficiary's] ability to work." 20 C.F.R. § 404.1594(a). The focus is on the individual's current condition and does not involve a review of the decision that initially awarded disability benefits. *See, e.g.*, *id.* § 404.1594(c)(3)(ii) (explaining that, where a prior RFC assessment was made, it would be compared to an "assessment based on current evidence in order to determine if your functional capacity for basic work activities has increased" but "[t]here will be no attempt made to reassess the prior residual functional capacity").

**2.** Entitlement to disability benefits is also subject to review in cases of suspected fraud. The Act provides that "[t]he Commissioner of Social Security shall immediately redetermine the entitlement of individuals" to benefits "if there is reason to believe that fraud or similar fault was involved in the application of the

individual for such benefits," unless a prosecutor certifies that such action would jeopardize a criminal prosecution.  42 U.S.C. § 405(u)(1)(A) (emphasis added).

Such redeterminations may be triggered by a referral from SSA's Inspector General.  By law, "[a]s soon as the Inspector General [of SSA] has reason to believe that fraud was involved in the application of an individual" for benefits, "the Inspector General shall make available to [SSA] information identifying the individual" (again, unless doing so would jeopardize a criminal prosecution). 42 U.S.C. § 1320a-8(*l*).  In making a redetermination SSA "shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence," *id.* § 405(u)(1)(B), and evaluate entitlement as of the original date of the allowance based on any relevant evidence, whether new or previously submitted.  *See* Social Security Ruling 16-1p, 81 Fed. Reg. 13436, 13437 (Mar. 14, 2016).  Thus, unlike continuing disability reviews, which assume the correctness of the initial decision awarding benefits, the focus in redetermination proceedings is on the propriety of the initial decision, not the beneficiary's current condition.

Redeterminations, like initial determinations of entitlement, are subject to administrative appeal and judicial review.  A dissatisfied beneficiary is entitled to a hearing before an administrative law judge (ALJ) within SSA's Office of Disability Adjudication and Review (ODAR), *see, e.g.*, 42 U.S.C. § 405(b)(1);

20 C.F.R. §§ 404.929, 404.930, and may seek further review by the Appeals

Council, *see, e.g.*, 20 C.F.R. 404.967. "Proceeding through these . . . stages

exhausts the claimant's administrative remedies." *Bowen*, 476 U.S. at 472.[2]

Thereafter, a claimant may seek judicial review in federal district court pursuant to

42 U.S.C. § 405(g), which provides for review "by a civil action" of "any final

decision of the Commissioner of Social Security made after a hearing."

### B.    Factual Background

Plaintiffs Cheryl Martin and Robert Martin (no relation) are former clients of

attorney Eric C. Conn. Both retained Conn to represent them in their claims for

benefits based on injuries sustained in automobile accidents. Both relied on the

evidence provided by Dr. Frederic Huffnagle. And both received favorable

decisions in 2009 from ALJ Judge David B. Daugherty. Am. Compl., RE 11,

PageID# 130, 132. As discussed below, the Inspector General concluded that

Conn, Huffnagle, and Judge Daugherty were involved in a far-reaching attempt to

defraud SSA, and that there was reason to believe that fraud was involved in

plaintiffs' applications for benefits.

---

[2] For initial determinations that begin in state agencies, a claimant must first seek *de novo* reconsideration by the relevant state agency that denied the claim before seeking a hearing before an ALJ. 20 C.F.R. §§ 404.900 *et seq.* But some redeterminations may take place entirely within ODAR, *see* SSA, *Hearings, Appeals, and Litigation Law Manual* (HALLEX) I-1-3-25(B)(1) (last updated Feb. 25, 2016), making recourse to the state agency unnecessary.

### 1.    The Fraudulent Scheme of Attorney Eric Conn And Administrative Law Judge David B. Daugherty

Following a two-year investigation, the staff of the Senate Committee on Homeland Security and Governmental Affairs (Senate Staff) concluded in October 2013 that Eric Conn and Administrative Law Judge (ALJ) David B. Daugherty "had collaborated on a scheme that enabled the judge to approve, in assembly-line fashion, hundreds of clients for disability benefits using manufactured medical evidence."  U.S. Senate Committee on Homeland Security and Governmental Affairs, Staff Report, *How Some Legal, Medical, and Judicial Professionals Abused Social Security Disability Programs for the Country's Most Vulnerable: A Case Study of the Conn Law Firm* 2 (Oct. 7, 2013) (Senate Staff Report), *available at* http://www.hsgac.senate.gov/download/?id=0B4A6130-EC07-4D20-860B-88994B20E79A.  According to the report, from at least June 2006 to July 2010, "Judge Daugherty telephoned the Conn law firm each month and identified a list of Mr. Conn's disability claimants to whom the judge planned to award benefits," further indicating "whether he needed a 'physical' or 'mental' opinion from a medical professional indicating the claimant was disabled."  *Id.* at 5.  Personnel at Conn's law firm referred to this list as the "DB" list, after the judge's first and middle initials.  *Id.*

After receiving the DB List, "Mr. Conn's office scheduled appointments for the identified claimants with certain doctors favored by the law firm" and provided

the doctors with "residual functional capacity ('RFC') forms in which the medical information was already filled out." Senate Staff Report 5. Some of the doctors examined claimants in a "medical suite" in the Conn law firm offices. *Id.* For example, Dr. Frederic Huffnagle, who provided evidence for both of the named plaintiffs, traveled 250 miles to Conn's offices, where he would meet with up to 35 claimants a day "in 10 to 20 minute increments." *Id.* at 60. Dr. Huffnagle and other providers involved in the scheme "signed the forms [filled out by Conn's firm] without making any changes," even if the "pre-filled forms contained information that conflicted with other information in the claimant's case file." *Id.* at 5. These pre-filled forms were based on a limited number of templates. *Id.* "In almost all cases, only the names and Social Security numbers on the forms differed." *Id.*; *see also id.* at 62 ("For example, 54 of Mr. Conn's claimants reviewed by Dr. Huffnagle submitted 'RFC Form Version 1,' indicating they all had the same limitations."). The Senate Staff concluded that "[a]ssigning multiple claimants the same RFCs was not an accident, but rather appears to have been an effort to tailor evidence to Judge Daugherty's preferences." *Id.* at 61.

For his part, Judge Daugherty "routinely reassigned himself [to] Mr. Conn's cases," even if they had been already set for hearing before other ALJs. Senate Staff Report 5, 37. He then approved them at a remarkably high rate, usually "on-the-record without a hearing." *See id.* at 34 ("Between 2005 and 2011, Judge

10

Daugherty never once denied benefits to a claimant represented by Mr. Conn."); *id.* at 36 ("In 2008, for example, Judge Daugherty approved 429 of Mr. Conn's cases, but held no hearings on cases represented by Mr. Conn.").

The Senate Staff Report found that "[f]rom cases on the DB Lists alone, over the four year period from 2006 to 2010, [SSA] paid Mr. Conn over $4.5 million in attorney fees." Senate Staff Report 6.[3]  In 2010, Conn's was the third-highest paid disability law firm in the country, despite operating in a sparsely populated town of 500 in eastern Kentucky more than two hours away from the nearest major city. *Id.* at 2, 6.  The doctors used by Conn also received substantial fees—five of these doctors received $2 million from Conn over six years for their disability opinions. *Id.* at 6.  And as for Judge Daugherty, the Senate Staff found that his "bank records contain regularly occurring cash deposits" unexplained by the judge's financial disclosure forms or by the judge himself in response to inquiry from the Senate Staff. *Id.*

---

[3] Under certain circumstances, an attorney may obtain payment of fees relating to representation in administrative proceedings directly from SSA. Specifically, if a beneficiary receives past-due benefits as a result of a favorable determination of entitlement, SSA "will pay the representative out of the past-due benefits" up to 25 percent of the past-due benefits.  20 C.F.R. § 404.1730(b).  The Social Security Act also provides a streamlined "fee agreement process" under which fees are further limited to a maximum of $6000.  *See* Notice, 74 Fed. Reg. 6080 (Feb. 4, 2009) (increasing the maximum dollar limit to $6,000).

On April 1, 2016, federal prosecutors obtained an indictment charging Conn, Daugherty, and a psychologist frequently hired by Conn with seven counts of mail fraud, wire fraud, and conspiracy to commit both. *See* Indictment, *United States v. Conn*, No. 5:16-cr-22 (E.D. Ky. Apr. 1, 2016). The scheme alleged in the indictment tracked the findings of the Senate Staff Report, including allegations that Daugherty assigned Conn's cases to himself; that Daugherty solicited falsified medical evidence from Conn so that he could issue favorable on-the-record decisions without hearings; that Conn provided pre-completed template RFC reports to doctors who signed them without amendment; that Conn received fees from SSA; and that Conn withdrew cash from his business account to make payments to Daugherty. *Id.* at 9-19. The indictment alleged that the conspirators "intended that the SSA disburse retroactive and proactive disability benefits, [in] an amount to exceed $600,000,000, . . . irrespective of the Claimants' actual entitlement to benefits." *Id.* at 16. Conn was also charged with conspiracy to retaliate against a witness, destruction of records relating to a federal investigation, making false statements, and various financial crimes. *Id.* at 20-28.

### 2. SSA's Response To The Fraud

#### a. Investigation And Referral By The Office Of The Inspector General

As details of the relationship between Conn and Judge Daugherty first became public, and around the same time that the Senate Staff began its

investigation of Conn, SSA leadership placed Judge Daugherty on administrative leave and asked the agency's Office of the Inspector General (OIG) to investigate. Senate Staff Report 1.

On May 12, 2015, SSA received a referral from OIG pursuant to section 1129(*l*) of the Act, 42 U.S.C. § 1320a-8(*l*).  OIG Referral, RE 30-2, PageID # 432; *see also* Disman Decl. II, RE 30-1, PageID #429-30.  The referral declared that OIG "had reason to believe that fraud was involved in th[e] applications for Social Security benefits" of 1,787 individuals formerly represented by Conn.  *Id.*  OIG explained that it had reason to believe that "Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from" one of four doctors, including Dr. Frederic Huffnagle, "in support of the individuals' applications for benefits."  *Id.*  The underlying information regarding the 1,787 individuals had initially been provided to SSA in July 2014.  *Id.*  At that time OIG advised that SSA should not take action until the OIG investigation had been fully reviewed by the U.S. Department of Justice for potential prosecution.  *See* 42 U.S.C. §§ 405(u)(1)(A), 1320a-8(*l*) (making OIG referrals and SSA redeterminations contingent on a lack of objection from law enforcement).  In the May 2015 referral, OIG formally informed SSA that it was free to proceed with redeterminations of the affected individuals' entitlement to benefits.  OIG Referral, RE 30-1, PageID# 32.

13

### b.    The Redetermination Process

As the first step in the redetermination process, the Appeals Council reviewed every case subject to the OIG referral to determine whether the beneficiary's original decision could be supported.  During this initial review, a minimum of two staff members of the Office of Appellate Operations within ODAR considered whether, after disregarding evidence submitted by the doctors identified by OIG, the remaining evidence in the case file established entitlement to benefits.  Disman Decl. I, RE 15-1, PageID#211; *see* 42 U.S.C. § 405(u)(1)(B)(instructing SSA to disregard evidence if there is reason to believe that fraud was involved in providing such evidence).  The Appeals Council found that there was sufficient evidence for 242 (or 13.5%) of the individuals included in the OIG referral and left their original benefits determinations undisturbed.  For the remainder of the affected individuals, SSA determined that their case files did not contain sufficient non-tainted evidence to establish entitlement, and that a hearing would be required to complete the redetermination.  Disman Decl. I, RE 15-1, PageID# 211.

On May 18, 2015, SSA sent redetermination notices to all individuals, including the named plaintiffs, whose cases required a hearing.  Disman Decl. I, RE 15-1, PageID#212; *see* Redetermination Notices, RE 1-3 & 1-6, PageID# 19-22, 27-30.  The notices informed them that the Inspector General had notified SSA

14

that there was reason to believe that fraud was involved in applications for benefits involving evidence from four doctors, and that SSA was required by law to redetermine entitlement to benefits when there is reason to believe that fraud was involved in an individual's application.  The notices explained that, when conducting a redetermination, SSA must disregard any evidence from one of those four doctors if it had been submitted by Conn's firm.  Redetermination Notices, RE 1-3 & 1-6, PageID# 19, 27.

The redetermination notices received by Cheryl Martin and Robert Martin stated that the Appeals Council had reviewed their cases and determined that a new hearing before an ALJ was required.  The notices explained that Dr. Huffnagle, one of the four doctors identified by OIG as a participant in the fraudulent scheme, had provided the evidence relied on by the ALJ in making their initial disability decisions.  Indeed, the ALJ in their cases (*i.e.*, Judge Daugherty) had cited only to evidence from Dr. Huffnagle, which must now be disregarded, and did not evaluate any of the evidence or opinions in their case files from other medical or psychological sources, in violation of SSA regulations.  SSA noted that this other evidence indicated that plaintiffs had severe impairments that reasonably could be expected to cause some work-related limitations.  The evidence was insufficient, however, to support the residual functional capacity findings or disability findings made by the ALJ.  Redetermination Notices, RE 1-3 & 1-6, PageID# 19-21, 27-29.

15

The notices advised the named plaintiffs that the Appeals Council planned to send their cases to a different ALJ than the one who initially considered their claims, but would not act for ten days.  During that time, they could send more evidence or a statement for consideration by the Appeals Council.  "However," the notices went on, "if you cannot obtain the information within 10 days, you will have additional time to submit evidence . . . to the Administrative Law Judge."  Redetermination Notices, RE 1-3 & 1-6, PageID# 20-21, 28-29.  As noted below, the agency also routinely extended that deadline upon request, even when the request was submitted after the ten-day period expired.  Disman Decl. I, RE 15-1, PageID# 212-13.

In a separate document also dated May 18, 2015, SSA informed individuals subject to the OIG referral who were receiving benefits under Title II of the Act (*e.g.*, SSDI benefits), including the named plaintiffs, that their benefits would be suspended during the redetermination process.  Disman Decl. I, RE 15-1, PageID# 212; *see* Suspension Notices, RE 1-2 & 1-5, PageID# 17, 25.[4]  Approximately two weeks later, however, the Acting Commissioner decided to cancel the suspensions until the individuals were given the opportunity for a hearing before an ALJ and

---

[4] Individuals receiving benefits under Title XVI (*i.e.*, SSI) did not receive such notices because they have a constitutional right to an evidentiary hearing before benefits are terminated.  *See Goldberg v. Kelly*, 397 U.S. 254 (1970).  SSDI beneficiaries have no such right.  *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

the ALJ made a final decision.  Disman Decl. I, RE 15-1, PageID# 212.

Accordingly, affected individuals would continue to receive benefits unless and

until an ALJ reached an adverse decision after a hearing.

### C.    Prior Proceedings

**1.**  On May 30, 2015, Cheryl Martin and Robert Martin filed a putative class

action complaint on behalf of "[a]ll persons, formerly clients of Eric C. Conn, who

were receiving Social Security Disability (SSD) benefits during or prior to May

2015, and whose benefits are being suspended, without a pre-suspension hearing"

based on the fact that evidence had been provided by one of the four doctors

identified by OIG in its referral notice.  Compl., RE 1, PageID# 8.  The complaint

alleged that the suspension of benefits without a hearing violated the Act, SSA

regulations, and the Constitution.  *Id.* at PageID# 10-13.

After SSA announced that it would *not* suspend benefits prior to an ALJ

decision, plaintiffs filed an amended complaint, again claiming to represent a class

of SSDI beneficiaries.  Am. Compl., RE 11, PageID# 133-34.[5]  The amended

complaint asserted three distinct legal claims, beginning with allegations that SSA

---

[5] Because the complaint defines class membership by reference to receipt of "Social Security Disability (SSD) benefits," Am. Compl., RE 11, PageID# 133, plaintiffs did not plead a putative class action on behalf of "all 1,500 recipients" who received redetermination notices.  Br. 3.  Redetermination notices were sent to recipients of both SSDI and SSI benefits.  The putative class of SSDI recipients includes approximately 900 individuals.

17

had violated the Act and the agency's implementing regulations. *Id.* at PageID#
138-39.

The amended complaint next asserted three specific due process violations.
First, "to commence" the redetermination hearings "would violate the due process
rights of the Plaintiffs given" a purported regional "representational crisis" caused
by uncertainty regarding "entitlement to attorney fees" under SSA regulations, and
a supposed "lack of time to gather necessary evidence to [e]nsure fair hearings."
Am. Compl. RE 11, PageID# 140.

Second, the hearings "violated Plaintiffs['] due process rights by failing to
follow the Social Security Act and regulations." Am. Compl., RE 11, PageID#
140.

And third, "SSA has acted arbitrarily and disregarded the requirements of its
own statute, by . . . subjecting the entire class to redetermination of eligibility
without any further reason to believe that fraud or similar fault was involved in
each recipient's individual application; all in violation of Sec. 205(u)(1)(A)." Am.
Compl., RE 11, PageID# 140.

Finally, the Amended Complaint asserted in cursory fashion that SSA's
conduct violated the Equal Protection Clause, based on the fact that "[p]laintiffs
are all members of a class of persons receiving Social Security Disability benefits."
Am. Compl., RE 11, PageID# 141. (It also stated without elaboration that SSA

18

had violated the Americans with Disabilities Act, but this does not appear to have been offered as a separate legal claim.  *See id.* at PageID# 138.)

**2.**  On the government's motion, the district court dismissed the amended complaint as premature.  The court explained that, under the Act's provisions for judicial review, "[c]ourts have jurisdiction to review only the 'final decision of the Commissioner . . . made after a hearing.'"  Mem. Op., RE 33, PageID#438 (quoting 42 U.S.C. §§ 405(g)).  Thus, to obtain judicial review, a claimant must first "'present' her claim to the Commissioner" and second "complete all the steps in the SSA's internal administrative review process, also known as the 'exhaustion' requirement."  *Id.*

The plaintiffs in this case, the district court held, had not exhausted their administrative remedies.  The court rejected plaintiffs' argument that the decision to redetermine the entitlement of some beneficiaries was a final decision.  The court observed that "[d]eciding to redetermine eligibility based on the *suspicion* of fraud is not the same as denying an individual benefits because his claim is fraudulent."  Mem. Op., RE 33, PageID# 439.

The district court also rejected plaintiffs' argument that it should waive the exhaustion requirement.  Mem. Op., RE 33, PageID# 439-40.  The court explained that plaintiffs' challenge to SSA's decision to conduct redetermination hearings "is not 'entirely collateral' to their substantive claims for benefits" because a decision

19

in their favor would result in continuation of those benefits. *Id.* at PageID# 440.[6]
Further, a review of the claims in plaintiffs' complaint "would not involve
'completely separate issues' from the [c]ourt's review of the plaintiffs' entitlement
to benefits." *Id.* To determine whether the doctors identified by SSA had provided
fraudulent evidence or were in fact telling the truth, the court explained that it
might well need to "examine whether the plaintiffs are actually disabled" by
consulting "corroborating evidence from other doctors"—the very same question
and evidence at issue in the redetermination hearings. *Id.* at Page ID# 440-41.
Finally, the district court held that it did not have federal question or mandamus
jurisdiction as plaintiffs had urged. *Id.* at PageID# 443-445.

Plaintiffs moved for reconsideration, and the district court denied the
motion. Mem. Op. Recons., RE 40, PageID# 523-33. The court rejected
plaintiffs' argument that, if their complaint were dismissed, "SSA's decision to
redetermine their eligibility in the first place is 'shielded' or 'immun[e]' from
judicial review." *Id.* at PageID# 525 (alteration in original). The court explained
that "the plaintiffs will eventually be able to challenge that decision in court; they

---

[6] The district court at times referred to a "reopening" of plaintiffs' cases,
perhaps because that is how plaintiffs have described SSA's action. *See, e.g.*, Br.
26. Section 405(u), the authority relied on by SSA, authorizes the agency to
conduct a "[r]edetermination of entitlement." 42 U.S.C. § 405(u). This is not the
same as a "reopening," which is conducted under different authority. *See
Robertson v. Colvin*, 2016 U.S. Dist. Lexis 79007, at *6 (S.D.W.V. June 17, 2016).

20

just cannot do so now." *Id.* at PageID# 526. Even though SSA would not consider plaintiffs' challenges to that decision "during the redetermination hearings, they may still obtain judicial review of their claims *after* they complete the SSA's appeals process." *Id.* at PageID #527.

The court again rejected plaintiffs' arguments that exhaustion should be waived. Even though it found "persuasive[e]" their arguments "that erroneous termination would in fact damage them in ways retroactive payments could not correct," the court reaffirmed its holding that the plaintiffs' claims were not collateral to their claims for benefits. Mem. Op. Recons., RE 40, PageID # 527. The court stated that the plaintiffs' process-based claims "can be construed two ways": first, as a request that the court "make the ALJs consider the allegedly fraudulent evidence from the four doctors and make an independent credibility determination of that evidence during their hearings," or second, as a request that the court "rule on whether the SSA rightfully [identified] their cases for redetermination before they have exhausted their administrative remedies." *Id.* at PageID #528. The court could not grant the first request because "[c]hallenges to evidentiary rules at administrative hearings are not open to premature collateral attack." *Id.* at PageID #529. It could not grant the second request because "if the Court invalidated the SSA's decision to redetermine the plaintiffs' eligibility, their disability benefits would continue." *Id.* at PageID# 529-30. "Thus," the court

concluded, "the plaintiffs' claims in this lawsuit are not entirely collateral to the benefit claims themselves."  *Id.* at PageID# 530.

The district court rejected the plaintiffs' argument that administrative exhaustion was futile, and explained that, in any event, "futility alone is not sufficient to justify an exception to administrative exhaustion."  Mem. Op. Recons., RE 40, PageID# 532.

### D.     Administrative Proceedings Following The Filing Of Suit

After sending the redetermination notices, SSA received requests from over 600 people for additional time in which to submit evidence to the Appeals Council before their cases were remanded to an ALJ.  Disman Decl. I, RE 15-1, PageID#212.  The Appeals Council granted a 30-day extension (plus five days for mailing) to every beneficiary who requested an extension before the claimant's case was remanded, even if the request was made after the ten-day period provided in the notice has expired.  *Id.* at PageID# 213.  Both plaintiffs received such extensions from the Appeals Council.

Beneficiaries also have additional time to submit evidence after their cases are remanded to an ALJ.  In fact, beneficiaries may submit any statements or evidence in support of the original disability decision at any time up to the date of their hearing, even if they did not submit anything to the Appeals Council.  Disman Decl. I, RE 15-1, PageID #214.  A hearing will not occur sooner than 50 days after

the case is docketed by the hearing office on remand.  *Id.* at PageID# 213.  If more time is needed to gather evidence that was not initially submitted to SSA,[7] a beneficiary may request a postponement of the hearing from the ALJ.  Both plaintiffs requested and received such postponements.

As of July 28, 2016, 1,220 beneficiaries have received redetermination decisions from ALJs, of which 43.58% were completely favorable and 2.92% were at least partly favorable.  217 beneficiaries have exhausted their administrative remedies by seeking review from the Appeals Council, and approximately 75 have sought judicial review.

Robert Martin received a hearing before an ALJ on January 28, 2016, approximately 8 months after receiving his redetermination notice.  The ALJ considered all of the evidence in the record relating to the period prior to the original allowance date, including newly submitted evidence, but as required by § 405(u), did not consider a report by Dr. Huffnagle.  In a decision issued on March 30, 2016, the ALJ concluded that there was insufficient evidence to support a finding of disability as of the date of the original decision, and ordered Robert Martin's benefits terminated.  The Appeals Council denied review.  Robert Martin

---

[7] SSA has in its possession all of the evidence that was submitted during the initial determination proceedings.  A copy of the beneficiary's case file, which includes the OIG referral, is also made available to the claimant when the case is remanded to an ALJ.  Disman Decl. II, RE 30-1, PageID# 430.

has sought judicial review of the ALJ's decision in federal district court.  *See*

Complaint, *Martin v. SSA*, No. 7:16-cv-111 (E.D. Ky. June 3, 2016).

Cheryl Martin received a hearing before an ALJ on February 23, 2016,

approximately 9 months after she received her redetermination notice.  She has not

yet received a decision and therefore continues to receive benefits.[8]

## SUMMARY OF ARGUMENT

The Social Security Act creates a "special review system" that "demands the

'channeling' of virtually all legal attacks through the agency."  *Shalala v. Illinois*

*Council on Long Term Care, Inc.*, 529 U.S. 1, 8, 12 (2000).  The jurisdiction of

federal courts to review claims under the Act turns on whether the claimant has

received a "final decision . . . made after a hearing," 42 U.S.C. § 405(g), which

requires exhaustion of the administrative remedies prescribed by the agency.  *See*

*Bowen v. City of New York*, 476 U.S. 467, 482-83 (1986).

Plaintiffs in this case concede that they did not exhaust their administrative

remedies and that SSA did not waive exhaustion.  They argue instead that the

district court should have deemed the requirement waived.  Such judicial waiver of

---

[8] Plaintiffs ask that, in the event Cheryl Martin exhausts her administrative remedies before their appeal can be resolved, this Court "retain jurisdiction and remand this case to the district court to allow plaintiffs to amend their pleadings to add additional class representatives who have not exhausted their administrative relief."  Br. 5.  The government takes no position at this time on the propriety of remand, but will notify the Court as soon as Cheryl Martin has exhausted her administrative remedies.

exhaustion is only appropriate in cases where, at a minimum, the plaintiff's claim is "entirely collateral to [a] substantive claim of entitlement" to benefits and the plaintiff "ha[s] raised 'at least a colorable claim'" that "'an erroneous termination would damage him in a way not recompensable through retroactive payments." *Bowen*, 476 U.S. at 483 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 331 (1976)). But even where these conditions are met, "[t]he ultimate decision of whether to waive exhaustion" is "intensely practical" and must be "guided by the policies underlying the exhaustion requirement." *Id.* at 484.

This is not one of the rare "special cases," *Heckler v. Ringer*, 466 U.S. 602, 618 (1984), in which judicial waiver of the exhaustion requirement is appropriate. First, the plaintiffs' claims are not entirely collateral to their claim of entitlement to benefits. Their due process claim, the only one they argue should not be subject to exhaustion, has been variably presented as an argument that SSA should not have instituted redetermination proceedings at all or as an objection to SSA's interpretation and application of a statutory evidentiary rule. Either way, plaintiffs' claim cannot reasonably be characterized as involving issues completely separate from their entitlement to benefits. Second, plaintiffs have failed to connect any possible harm resulting from the redetermination proceeding to a "colorable constitutional claim." *Oakland Med. Grp. v. Secretary of Health & Human Servs.*, 298 F.3d 507, 511 (6th Cir. 2002). Third, the policies underlying the exhaustion

25

requirement weigh heavily in favor of enforcing the requirement in this case. Evaluation of their claims relating to sufficiency of time to develop evidence and prejudice resulting from the alleged unavailability of pro bono legal representation would benefit from development of an administrative record. The fact that nearly half of the redetermination hearings completed so far have resulted in favorable decisions shows that exhaustion would not be futile. Moreover, as a practical matter, the hearings that plaintiffs sued to stop have already concluded for the majority of putative class members. Nearly half of those received favorable decisions, and those who did not are free to seek review of final agency decisions in the normal course.

## STANDARD OF REVIEW

"A district court's legal determinations in dismissing a complaint for lack of subject matter jurisdiction are reviewed de novo, while any factual findings are reviewed for clear error." *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 358 (6th Cir. 2000).

**ARGUMENT**

I.    **The District Court Correctly Dismissed Plaintiffs' Complaint For Failure To Exhaust Administrative Remedies**

A.    **The Social Security Act Requires The Channeling Of Claims Through SSA Before They Can Be Raised In Court**

The Social Security Act "channels most, if not all," claims for disability benefits through a "special review system" created by the Act. *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 8 (2000). Under that system, only an individual aggrieved by a "final decision of the Commissioner of Social Security made after a hearing to which he was a party" may obtain judicial review in federal district court. 42 U.S.C. § 405(g); *see also Weinberger v. Salfi*, 422 U.S. 749, 764 (1975) (explaining that the requirement of a final decision is "central to the requisite grant of subject-matter jurisdiction" in § 405(g)). In order to obtain a final decision, a claimant must, first, present the claim for benefits to SSA and, second, exhaust the administrative remedies prescribed by the agency. *See Bowen v. City of New York*, 476 U.S. 467, 482-83 (citing *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)). The first requirement is "nonwaivable." *Heckler v. Ringer*, 466 U.S. 602, 617 (1984). The second can be waived by SSA, or a court can "deem" it waived "in certain circumstances, even though the agency technically holds no 'hearing' on the claim." *Illinois Council*, 529 U.S. at 24 (citing *Eldridge*, 424 U.S. at 330-31). Congress made this avenue of judicial review exclusive, by providing

27

that "[n]o findings of fact or decision" by SSA "shall be reviewed by any person, tribunal, or governmental agency except as herein provided," and also by foreclosing alternative bases of jurisdiction over "any claim" arising under the Act. 42 U.S.C. § 405(h).

The Supreme Court explained in *Illinois Council* that this special review system "reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies,'" which are subject to well-established exceptions, and instead "demands the 'channeling' of virtually all legal attacks through the agency."  529 U.S. at 12-13.  The stringent channeling requirement "assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying 'ripeness' and 'exhaustion' exceptions case by case." *Id.* at 13.  The Court recognized that "this assurance comes at a price, namely occasional individual, delay-related hardship." *Id.*  But "[i]n the context of a massive, complex . . . program such as [Social Security], embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified." *Id.*  At least, "such was the judgment of Congress." *Id.*; *see also Ringer*, 466 U.S. at 627 ("Congress must have felt that cases of individual hardship resulting from delays in the administrative process had

28

to be balanced against the potential for overly casual or premature judicial intervention in an administrative system that processes literally millions of claims a year.").

*Illinois Council* emphasized the broad reach of the channeling requirement. The Court rejected "distinctions based upon the 'potential future' versus the 'actual present' nature of the claim, the 'general legal' versus the 'fact-specific' nature of the challenge, the 'collateral' versus 'noncollateral' nature of the issues, or the 'declaratory' versus 'injunctive' nature of the relief sought."  529 U.S. at 13-14.  It also explained that the channeling requirement is not limited to specific types of relief.  "Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions."  *Id.* at 14.  The Court found "no reason to distinguish among them."  *Id.*  Nor should claims be split "into 'substantive' and 'procedural' elements" for the purposes of permitting premature judicial review of the latter.  *Ringer*, 466 U.S. at 614.  The rule is that "all aspects of [a] claim for benefits should be channeled first into the administrative process which Congress has provided."  *Id.*; *see also Illinois Council*, 529 U.S. at 12 (same).

## B.     Waiver Of Exhaustion Is Not Appropriate

Plaintiffs concede that they did not exhaust their administrative remedies, Br. 22, and they do not claim that SSA has exercised its discretion to waive the requirement in this litigation.  They argue instead that the district court should have waived the exhaustion requirement and interrupted ongoing administrative proceedings to consider the objections alleged here.

Ordinarily, the decision whether to waive the exhaustion requirement is left to SSA's discretion.  *See Bowen*, 476 U.S. at 483.  But "in certain special cases, deference to [SSA's] conclusion as to the utility of pursuing the claim through administrative channels is not always appropriate."  *Ringer*, 466 U.S. at 618. These "special" cases share two features in common: first, the plaintiff's claim was "'entirely collateral to [a] substantive claim of entitlement'" to benefits; and second, the plaintiff "had raised 'at least a colorable claim'" that "'an erroneous termination would damage him in a way not recompensable through retroactive payments.'"  *Bowen*, 476 U.S. at 483 (quoting *Eldridge*, 424 U.S. at 331) (alteration in original).[9]

_____

[9] Thus, while all claims, including those involving "collateral" issues, must be channeled through the administrative process, *Illinois Council*, 529 U.S. at 14, the collateral nature of a claim may be relevant to a court's assessment of whether a plaintiff has obtained a sufficiently final decision to permit judicial review, *see id.* at 24 (citing *Eldridge*, 424 U.S. at 331-32 & n.11).  But the Supreme Court's emphasis in *Illinois Council* on the importance of "provid[ing] the agency the

*Continued on next page.*

These two conditions are necessary but not sufficient to permit the waiver of the exhaustion requirement.  "The ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the *Eldridge* factors, but should also be guided by the policies underlying the exhaustion requirement" and a recognition that the "application of the exhaustion doctrine is 'intensely practical.'"  *Bowen*, 476 U.S. at 484.

### 1.    Plaintiffs' Claims Are Not "Entirely Collateral" To A Claim For Benefits

The amended complaint asserts three distinct legal claims: one based on the "Social Security Act & Regulations Promulgated Thereunder," a second based on the Due Process Clause, and a third based on the Equal Protection Clause.  Am. Compl., RE 11, PageID# 138-41.  Plaintiffs' opening brief offers no argument that either the first or third claim is "entirely collateral" to a claim for benefits.  They have therefore forfeited any argument that these claims need not be administratively exhausted before they can be considered in court.  *See Golden v. Commissioner*, 548 F.3d 487, 493 (6th Cir. 2008).

That leaves their due process claim.  As pled in the amended complaint, the only aspect of this claim that is not a restatement of their statutory violation claim

---

opportunity to reconsider its policies, interpretations, and regulations in light of [specific] challenges" to agency action, *id.* at 24, suggests that courts should be extremely reluctant to deem exhaustion waived, even for claims properly characterized as "collateral."

is the assertion that "to commence with hearings at the present juncture, would violate the due process rights of the Plaintiffs given the representational crisis and lack of time to gather necessary evidence to insure fair hearings."  Am. Compl., RE 11, PageID# 140.

This is not a claim that SSA failed to offer a full evidentiary hearing before terminating benefits, *see Eldridge*, 424 U.S. at 331; *Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 364 (6th Cir. 2000), or that it induced claimants into abandoning their opportunities for administrative review through inadequate notices, *see Day v. Shalala*, 23 F.3d 1052, 1059 (6th Cir. 1994).  This is a claim that SSA should not have started the administrative hearing process at all.  As the district court recognized, such a claim is not "entirely collateral" to a claim for benefits because "[i]f the [c]ourt held that the SSA wrongfully [selected] the plaintiffs' files for redetermination, the plaintiffs' disability benefits would continue without the possibility of termination."  Mem. Op., RE 33, PageID# 440; *see Cathedral Rock*, 223 F.3d at 363 (finding a claim "inextricably intertwined" with a substantive claim for benefits "because a favorable resolution of this claim would result in the reinstatement of" Medicare status).

In subsequent briefing before the district court, and again in this Court, the plaintiffs recast their due process claim as an "object[ion] to the *manner* in which the agency [redetermined] their claims—namely, the failure to present them with

32

the evidence underlying the fraud allegation and an opportunity [to] rebut it."  Br. 26; *see also* Pltfs' Mot. Recons., RE 35-1, PageID# 454 ("The basis of Plaintiffs['] challenge concerns procedural issues—whether certain evidence can be excluded, and whether they will be permitted to challenge the alleged fraud in the ALJ hearings.").

Although plaintiffs' reformulated argument is couched in the language of due process, at bottom they simply object to SSA's interpretation and application of an evidentiary rule in its statute.  Section 405(u)(1)(B) mandates that SSA "disregard any evidence if there is reason to believe that fraud . . . was involved in the providing of such evidence."  42 U.S.C. § 405(u)(1)(B).  SSA explained in the redetermination notices that this standard was triggered by finding in the Inspector General's referral pursuant to § 1320a-8(*l*) that "there was reason to believe fraud was involved in certain cases involving evidence from" four doctors, including Dr. Huffnagle.  Redetermination Notices, RE 1-3 & 1-6, PageID# 19, 27; *see also* OIG Referral, RE 30-2, PageID #432 (stating that it "had reason to believe that fraud was involved in [Conn's clients'] applications for Social Security benefits" because there is "reason to believe that Mr. Conn or his firm submitted pre-completed 'template' Residual Functional Capacity forms purportedly from [the four identified doctors] in support of [those] applications").

33

Plaintiffs urge that they should be allowed to dispute the application of § 405(u)(1)(B) based on the Inspector General's findings at their redetermination hearings before an ALJ. As the district court recognized, however, such "[c]hallenges to evidentiary rules at administrative hearings" cannot be reasonably characterized as "entirely collateral" to the ultimate decision whether the record evidence establishes disability. Mem. Op. Recons., RE 40, PageID# 529; *see Cathedral Rock*, 223 F.3d at 363 ("[A] court must examine whether the allegedly collateral claim involves *completely separate issues* from the party's claim that it is entitled to benefits . . . ." (emphasis added)); *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 580 (6th Cir. 1995) ("Plaintiffs'' claim that the [Commissioner] incorrectly applied its regulations . . . is not a claim that is 'collateral' to a claim for benefits."). Moreover, the way that plaintiffs would prove that the template forms signed by Dr. Huffnagle are truthful in their individual cases is to offer evidence from other sources that plaintiffs in fact suffered from the limitations identified in the suspect evidence. *See* Mem. Op., RE 33, PageID# 440. This is the same showing that would establish their entitlement to benefits.

Plaintiffs' arguments to contrary are not persuasive. They argue first that their claims are "wholly collateral" to a claim of entitlement because they have not requested "a ruling that they are entitled to disability benefits." Br. 23. But the

34

Supreme Court's opinion in *Illinois Council* teaches that a plaintiff cannot evade the special review system required by Congress in section 405 merely through strategic relabeling of the relief sought in a complaint. *See* 529 U.S. at 13-14.[10] What matters is that a ruling by the district court that SSA improperly selected their cases for redetermination "would mean continued entitlement to benefits." Mem. Op. Recons., RE 40, PageID# 529.

Next, the plaintiffs urge that exhaustion should be waived because "as in *Bowen*, they are bringing a systemwide, facial challenge to the process underlying the agency's redetermination hearings." Br. 25. As the district court explained, *Bowen v. City of New York* involved a challenge to a "secret policy to deny some claimants benefits to which they were legally entitled" that the claimants could not effectively challenge administratively. Mem. Op., RE 33, PageID# 441. The Supreme Court expressly relied on the "unique circumstances" of that case to support its holding, and it counseled that courts should not waive exhaustion "whenever a claimant alleges an irregularity in the agency proceedings." *Bowen*,

---

[10] Plaintiffs' suggestion that *Illinois Council* is "inapposite because [it] involved challenges brought under § 1331 federal-question jurisdiction only," Br. 27, misses the mark. The Court's holding in that case was based on its understanding that "[p]roceeding through the agency provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of [claimants'] challenges." *Illinois* Council, 529 U.S. at 24. That purpose would be thoroughly undermined by construing the Act to permit a claimant to rush into district court before the agency has had any real opportunity to consider the claim technically presented to it.

476 U.S. at 485.  The present case bears no resemblance to *Bowen*.  The plaintiffs "know exactly what the SSA is doing" and were expressly invited "to submit new medical evidence in support of their disabilities before and during their ALJ hearings."  Mem. Op., RE 33, PageID# 441-42; *see* Redetermination Notices, RE 1-3 & 1-6, PageID# 21, 29 (explaining that SSA would consider evidence about disability starting on or before the date of the original hearing decision).

Finally, plaintiffs' argument that "any constitutional claim will by definition be collateral to the benefits entitlement," Br. 32, has been repeatedly rejected by both the Supreme Court and this Court.  *See, e.g.*, *Elgin v. Department of Treasury*, 132 S. Ct. 2126, 2139-40 (2012) (holding that "petitioners' constitutional claims" were not "wholly collateral" because they were "the vehicle by which they seek to reverse" administrative action); *Harkness v. United States*, 727 F.3d 465, 471 (6th Cir. 2013) (requiring administrative exhaustion for a constitutional claim not "wholly collateral" to the statutory review scheme).

That is as true for due process challenges as for other constitutional claims. *Eldridge* "does not," as plaintiffs assert, "set forth a blanket rule exempting due process challenges from exhaustion" required by § 405(g).  *Taransky v. Secretary of U.S. Dep't of Health & Human Servs.*, 760 F.3d 307, 321 & n.14 (3d Cir. 2014). That is clear from *Ringer,* in which the Supreme Court refused to waive the exhaustion requirement because the asserted claims—including one brought

36

"under the Due Process Clause of the Fifth Amendment"—were not "wholly 'collateral' to their claim for benefits under the Act." *Ringer*, 466 U.S. at 610 n.7, 618. Unlike *Eldridge* and *Cathedral Rock*, where the claimants were afforded no hearing prior to the termination of benefits, plaintiffs here are being afforded pre-termination hearings and their challenges to the those hearings "can be meaningfully addressed" in federal court on subsequent judicial review. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994); *see Eldridge*, 424 U.S. at 331 n.11 (explaining that "the nature of the claim being asserted" is an "important facto[r] in determining whether . . . finality has been satisfied" and identifying the "core principle that statutorily created finality requirements should, if possible, be construed so as not to cause crucial collateral claims to be lost").[11]

## 2. The Plaintiffs Have Not Identified Harm Related To A Colorable Constitutional Claim

In addition to collaterality, plaintiffs must also establish "a colorable claim" that "an erroneous termination would damage [them] in a way not recompensable through retroactive payments." *Bowen*, 476 U.S. at 483 (internal quotation marks

---

[11] *See also Heckler v. Lopez*, 463 U.S. 1328, 1336 (1983) (Rehnquist, C.J., in chambers) ("I am not persuaded that just because respondents put the label 'constitutional' on their claim they can fit within the language of our opinion in *Mathews*. The constitutionality of the failure of the Secretary to provide pretermination hearings in *Mathews* appears substantially different to me from respondent's claim that their benefits were unlawfully terminated because of the Secretary's insufficient evidentiary showing.").

omitted).  They fail to make a sufficient showing here.  As an initial matter, nearly half of all putative class members whose entitlement has been redetermined have suffered no loss of benefits, and thus no harm, at all.  For those whose benefits are terminated, the likelihood is low that the terminations were erroneous.  No putative class member will lose any benefits before receiving an opportunity for a hearing and an unfavorable decision from an ALJ.  That is more process than the Constitution requires.  *See Eldridge*, 424 U.S. at 349 (holding that due process does not require an evidentiary hearing before termination of SSDI benefits).

Moreover, this Court has also considered whether the claimed injury would result from "a colorable constitutional claim."  *Oakland Med. Grp. v. Secretary of Health & Human Servs.*, 298 F.3d 507, 511 (6th Cir. 2002); *see also Cathedral Rock*, 223 F.3d at 364-66.  Like the plaintiffs in *Oakland Medical* and *Cathedral Rock*, plaintiffs here have not stated a colorable due process claim.

Due process requires that "some form of hearing is required before an individual is finally deprived of a property interest."  *Eldridge*, 424 U.S. at 333.  Here, SSA has gone beyond what due process requires by providing full evidentiary hearings before an ALJ for all putative class members before benefits are terminated.

Plaintiffs nevertheless claim that "to commence" the redetermination hearings "would violate the[ir] due process rights" because of a purported

"representational crisis" and a "lack of time to gather necessary evidence to [e]nsure fair hearings." Am. Compl. RE 11, PageID# 140. According to the amended complaint, this "representational crisis" is caused by a fear that "there would likely be no entitlement to attorney fees" under SSA regulations for representation in redetermination hearings. *Id.* at PageID# 136. In fact, the regulations contain no special restrictions on fees that can be earned in redetermination hearings. It is true that, because the beneficiaries in redetermination hearings are already receiving benefits, favorable decisions will not result in payments of past-due benefits from which attorney fees can be withheld by SSA. But the regulations provide that a fee may be authorized even if no benefits are payable. *See* 20 C.F.R. § 404.1725(b)(2).

In any event, there is no constitutionally based "entitlement to attorney fees." While a beneficiary has a statutory right to counsel at a redetermination hearing, *see* 42 U.S.C. § 406(a)(1), SSA has no constitutional obligation to *provide or pay for* counsel. *See Goldberg v. Kelly*, 397 U.S. 254, 270 (1970); *Lamay* v. *Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Bagby v. Harris*, 650 F.2d 836, 839 (6th Cir. 1981). Indeed, Congress expressly contemplated that claimants could be represented by persons "other than attorneys." 42 U.S.C. § 406(a)(1).

39

Plaintiffs' assertion that they lacked sufficient time to gather evidence was based on a mischaracterization of the administrative process, which did not limit beneficiaries to 30 days in which to collect evidence for their ALJ hearing. *Compare* Am. Compl., RE 11, PageID# 136 (claiming that "Defendants gave notice that the Class Members would have 30 days to submit medical evidence") *with* Disman Decl. I, RE 15-1, PageID# 212-14 (explaining that beneficiaries could request a 30-day extension before the Appeals Council before the cases were remanded, that hearings before an ALJ would not be scheduled sooner than 50 days after cases were remanded by the Appeals Council, and that beneficiaries could submit any evidence "up to the date of their hearing"). As a practical matter, beneficiaries have generally had lengthy periods in which to submit evidence, as plaintiffs' experiences show: Robert Martin had a total of 8 months from the date of the redetermination notices to submit evidence to the ALJ, and Cheryl Martin had 9 months.

Plaintiffs fare no better with their evidentiary objections. Their contention that they should be allowed to rely on Dr. Huffnagle's evidence does not rise to the level of a due process claim. Nor is the fairness of the redetermination proceedings compromised by the fact that ALJs will not "consider evidence that claimants successfully passed a continuing disability review." Br. 24. Such evidence is simply not relevant. Continuing disability reviews assume the correctness of the

40

initial decision granting benefits and ask whether, at the time of the review, "there

has been any medical *improvement* . . . related to [the claimant's] ability to work."

20 C.F.R. § 404.1594(a) (emphasis added).  Redeterminations proceedings under

section 405(u), by contrast, ask whether disability existed on "the date the

Administrative Law Judge initially allowed [the] claim."  Redetermination Notices,

Compl., RE1-3 & 1-6, PageID# 20, 28; *see also* Social Security Ruling 16-1p, 81

Fed. Reg. 13436, 13437 (Mar. 14, 2016) ("We will consider the claim only through

the date of the final determination or decision on the beneficiary's application for

benefits (*i.e.*, the original date of the allowance).").

> **3.    A Practical Consideration Of The Policies Underlying Exhaustion Counsels In Favor Of Enforcing The Requirement In This Case**

Even if plaintiffs could satisfy the two necessary conditions discussed above,

consideration of "the policies underlying the exhaustion requirement," *Bowen*, 476

U.S. at 484, weighs heavily against waiver here.  "Exhaustion is generally required

as a matter of preventing premature interference with agency processes, so that the

agency may function efficiently and so that it may have an opportunity to correct

its own errors, to afford the parties and the courts the benefit of its experience and

expertise, and to compile a record which is adequate for judicial review."  *Salfi*,

422 U.S. at 765.

41

In contrast to *Bowen v. City of New York*, in this case there is something "to be gained from permitting the compilation of a detailed factual record."  476 U.S. at 485.  Plaintiffs claim that they were denied due process because they need "additional time and assistance in finding old medical records" and "pro bono legal representation to navigate these complex proceedings."  Br. 24.  Evaluation of these claims would benefit from a record establishing how much time beneficiaries were actually given to collect and submit evidence (for example, both plaintiffs received extensions from the Appeals Council and their ALJs, and ultimately had 8 or 9 months to submit evidence), whether there is any basis for believing more time was needed,  whether they were able to obtain counsel (both plaintiffs did), and if they were not, whether the ALJ had complied with the "special duty to ensure that a full and fair administrative record is developed," *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986).

Courts have also considered whether further administrative proceedings would be futile when asking whether the purposes of exhaustion are served by requiring plaintiffs to return to the agency.  *See, e.g.*, *Bowen*, 476 U.S. at 485; *Ringer*, 466 U.S. at 619.  Here, exhaustion would in no sense be futile.  Plaintiffs' assertion that "there is no reasonable prospect that [they] could obtain any relief by pursuing the administrative process," Br. 30 (internal quotation marks omitted), is contradicted by fact.  Nearly half of the beneficiaries who have completed their

42

redetermination proceedings obtained at least partially favorable decisions from an ALJ, and 43.6% of such beneficiaries received a fully favorable decision. It is therefore simply untrue that SSA's initiation of redetermination proceedings, as required by statute, in which ALJs cannot review OIG's finding of reason to believe fraud had occurred, was "tantamount to a decision denying the [claim]" for benefits. *Id.* (alteration in original) (quoting *Mathews v. Diaz*, 426 U.S. 67, 76-77 (1976)).

Ultimately, this Court's "intensely practical" analysis, *Bowen*, 476 U.S. at 484, should be guided by the fact that the hearings plaintiffs wanted to stop have already concluded for a majority of the putative class members and will soon conclude for the rest. A great many putative class members have received favorable decisions (thus obviating any need for judicial review), and several others who have received adverse final decisions from the agency have filed their own lawsuits in compliance with § 405(g). Indeed, Robert Martin received a final decision from an ALJ on March 25, 2016, exhausted his administrative remedies by seeking review from the Appeals Council, and filed a complaint in district court seeking judicial review of his denial of benefits on June 3. *See* Complaint, *Martin v. SSA*, No. 7:16-cv-111 (E.D. Ky. June 3, 2016). There is no legal or logical basis for proceeding on this complaint when district courts are already considering the

same legal claims in suits brought by plaintiffs who have properly exhausted administrative remedies, and with the full benefit of an administrative record.

### C. There Is No Separate Futility Exception To The Exhaustion Requirement Of § 405(g)

Finally, plaintiffs briefly argue, Br. 30-32, that courts can waive the exhaustion requirement of § 405(g) based solely on a finding of futility. But judicially created exceptions to exhaustion, such as futility, are unavailable when exhaustion is statutorily required. *See Illinois Council*, 529 U.S. at 12-13 (explaining that "the bar of § 405(h) reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies'" and "prevents application of the 'ripeness' and 'exhaustion' exceptions," including futility); *Salfi*, 422 U.S. at 766 ("[A] 'final decision' is a statutorily specified jurisdictional prerequisite . . . and may not be dispensed with merely by a judicial conclusion of futility . . . ."); *see also Avocados Plus, Inc. v. Veneman*, 370 F.3d 1243, 1247-48 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it."); *Cochran v. U.S. Health Care Fin. Admin.*, 291 F.3d 775, 780 (11th Cir. 2002) (explaining that "judge-made exceptions" like futility "do not apply . . . to a statutorily-mandated exhaustion requirement").

*Bowen* makes clear that futility is relevant only as part of a broader inquiry into whether SSA has reached a sufficiently final decision, which includes evaluation of the two necessary *Eldridge* factors and a consideration of the policies

44

underlying the exhaustion requirement. *See* 476 U.S. at 483-85. Both *Ringer* and *Manakee Professional*, upon which plaintiffs rely, considered futility in the context of this broader inquiry, *see Ringer*, 466 U.S. at 618-19; *Manakee Prof'l*, 71 F.3d at 581, and *Manakee Professional* expressly described it as one of the "three factors to be considered in deciding whether to waive the exhaustion requirement" along with collaterality and irreparable harm, 71 F.3d at 574. But however futility is considered, it cannot be found here, as all of the putative class members who received favorable decisions at redetermination hearings could attest.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

ANDY LIU
    *General Counsel*

AMANDA GILMAN
    *Staff Attorney*

    *Social Security Administration*

BENJAMIN C. MIZER
    *Principal Deputy Assistant Attorney*
    *General*

KERRY B. HARVEY
    *United States Attorney*

MARK B. STERN
THOMAS PULHAM
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7323*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue, NW*
    *Washington, DC 20530*
    *202-514-4332*
    *thomas.pulham@usdoj.gov*

AUGUST 2016

45

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal

Rule of Appellate Procedure 32(a).  This brief contains 10,529 words.


*s/ Thomas Pulham*
Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2016, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Thomas Pulham*
Thomas Pulham

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government designates the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| RE 1 | Complaint | 1-14 |
| RE 1-2 | Exhibit B: Suspension Notice to Cheryl Martin | 17-18 |
| RE 1-3 | Exhibit C: Redetermination Notice to Cheryl Martin | 19-22 |
| RE 1-5 | Exhibit E: Suspension Notice to Robert Martin | 25-26 |
| RE 1-6 | Exhibit F: Redetermination Notice to Robert Martin | 27-30 |
| RE 11 | Amended Complaint | 126-142 |
| RE 15-1 | Declaration of Beatrice Disman I (July 17, 2015) | 210-214 |
| RE 30-1 | Declaration of Beatrice Disman II (Sept. 11, 2015) | 429-430 |
| RE 30-2 | Exhibit A: Inspector General Referral Pursuant to Section 1129($l$) of the Social Security Act | 432 |
| RE 33 | Memorandum Opinion and Order Granting Defendants' Motion To Dismiss | 436-445 |
| RE 34 | Judgment | 446 |
| RE 35-1 | Memorandum in Support of Plaintiffs' Motion for Reconsideration | 448-461 |
| RE 40 | Memorandum Opinion and Order Denying Plaintiffs' Motion for Reconsideration | 523-33 |
| RE 41 | Notice of Appeal | 534 |

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 405 (excerpts).........................................................................A1

42 U.S.C. § 1320a-8(*l*)............................................................................A4

**42 U.S.C. § 405 (excerpts)**

**§ 405. Evidence, procedure, and certification for payments**

. . .

**(g) Judicial review**

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia. As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations. The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the

A1

Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based. Such additional or modified findings of fact and decision shall be reviewable only to the extent provided for review of the original findings of fact and decision. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions. Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.

**(h) Finality of Commissioner's decision**

The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

. . .

**(u) Redetermination of entitlement**

**(1)(A)** The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that such action by the Commissioner of Social Security with regard to beneficiaries in a particular investigation would jeopardize the criminal prosecution of a person involved in a suspected fraud.

A2

**(B)** When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence.

**(2)** For purposes of paragraph (1), similar fault is involved with respect to a determination if—

> **(A)** an incorrect or incomplete statement that is material to the determination is knowingly made; or

> **(B)** information that is material to the determination is knowingly concealed.

**(3)** If, after redetermining pursuant to this subsection the entitlement of an individual to monthly insurance benefits, the Commissioner of Social Security determines that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments.

A3

**42 U.S.C. § 1320a-8(*l*)**

**§ 1320a-8.  Civil monetary penalties and assessments for subchapters II, VIII and XVI**

. . .

**(*l*) Protection of ongoing criminal investigations**

As soon as the Inspector General, Social Security Administration, has reason to believe that fraud was involved in the application of an individual for monthly insurance benefits under subchapter II of this chapter or for benefits under subchapter VIII or XVI of this chapter, the Inspector General shall make available to the Commissioner of Social Security information identifying the individual, unless a United States attorney, or equivalent State prosecutor, with jurisdiction over potential or actual related criminal cases, certifies, in writing, that there is a substantial risk that making the information so available in a particular investigation or redetermining the eligibility of the individual for such benefits would jeopardize the criminal prosecution of any person who is a subject of the investigation from which the information is derived.